COURT OF APPEALS OF VIRGINIA

Present: Judges Kelsey, McCullough and Senior Judge Clements
Argued at Chesapeake, Virginia


JAHKEEM AL-TAMIR SHEPPERSON

                                                    MEMORANDUM OPINION* BY
v.        Record No. 2107-11-1              JUDGE STEPHEN R. McCULLOUGH
                                                         OCTOBER 16, 2012
COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF THE CITY OF SUFFOLK
Westbrook J. Parker, Judge Designate

James L. Grandfield, Public Defender (Office of the Public
Defender, on brief), for appellant.

Alice T. Armstrong, Assistant Attorney General II (Kenneth T.
Cuccinelli, II, Attorney General, on brief), for appellee.


        Jahkeem Al-Tamir Shepperson argues that the trial court erred when it found the evidence

sufficient beyond a reasonable doubt to convict him of rape in violation of Code §§ 18.2-61 and

18.2-67.5:3, sodomy in violation of Code §§ 18.2-67.1 and 18.2-67.5:3, object sexual penetration in

violation of Code §§ 18.2-67.2(A)(2) and 18.2-67.5:3, and abduction with the intent to defile in

violation of Code §§ 18.2-47, 18.2-48, and 18.2-67.5:3. We find the evidence sufficient and affirm.

                                        BACKGROUND

        On October 14, 2009, appellant, who was standing across the street from N.P.'s house,

called over to her. N.P. knew appellant, who was a few years older. They had taken a class

together in high school, became friends, and exchanged text messages. At one point they had kissed

but they had never had a sexual relationship. N.P. mentioned to appellant that she had lost a case

for her eyeglasses. Appellant said he would help her find the case, or that he might have it. He said

_____
        * Pursuant to Code § 17.1-413, this opinion is not designated for publication.

he was going to his sister's house, at 132 Chestnut Street, to watch his niece until his sister returned home. After this exchange, N.P. returned home to do some cleaning and, about an hour after her conversation with appellant, she went to see him. It was about 3:00 p.m.

When she arrived, N.P. told appellant she could only stay for a few minutes. She and appellant sat down in the living room on a couch. Appellant told her that she was different from other girls, that she was more intense. This made N.P. feel uncomfortable "because it just seemed like it was out of left field." Appellant placed his arm around her. He then kissed her on the mouth. N.P. said this made her feel "odd" and "uncomfortable" so she pulled away from him and jumped up. She tried to leave. He pulled her back down to the couch.

Once she was back on the couch, appellant "went right back to" telling her how she was different and how he respected her. At some point, he started to pull her pants off, but not immediately after pulling her back down to the couch. She unsuccessfully tried to stop him. She grabbed appellant's wrist, saying something to the effect of "what are you doing?" She tried to push him, but "it wasn't working." He told her to "relax." She told him she wanted to leave, but he would not let her. He again told her to "relax" that "he wasn't going to do anything that serious."

Appellant then placed a pillow on the floor and pushed or pulled N.P. to the floor. She struggled with him, kicking him, striking him on the face, head, and arms, all to no avail. She said "stop" and told him many times that she was "not playing." N.P. tried to slide away, but could not because he was on top of her and there was an entertainment center in the way. At one point he pinned both of her arms over her head. He told her to "calm down," that he was "not going to hurt [her]." Appellant asked N.P. if she wanted him to get a condom. She replied "[n]o, I want you to get off me." Appellant then performed oral sodomy on N.P., digitally penetrated her, and proceeded to rape her. She continued to struggle, but she could not escape.

The rape was interrupted when a little girl opened the door to the living room. Appellant rose and raced to close the door. N.P. was able to get up and put her pants back on. She retrieved her keys and tried to run for the door. Appellant blocked her exit. He told her to "calm down," that he "didn't do anything." He told her he had feelings for her and that he wanted to know "where she was going after this." He told her she did not need to "freak out." Eventually, he let go of the door and she was able to get away.

N.P. called a friend and told her what happened. She then went to a hospital, about an hour and a half after the attack. A Sexual Assault Nurse Examiner performed an examination using a physical evidence recovery kit. A forensic examiner testified at trial that appellant's DNA matched the DNA found on swabs taken from the victim. He testified that "[t]he probability of randomly selecting an unrelated individual with the DNA profile matching the major profile developed from the [sample taken from N.P.] is . . . one in greater than 6.5 billion . . . ."

N.P. called her mother from the emergency room and told her that a friend had just raped her. Her mother described N.P. as upset, crying, and scared. N.P. identified appellant as the culprit. In the emergency room of the hospital, N.P. provided a statement to the police that is consistent with her trial testimony. The interviewing officer noted that N.P. was "extremely upset," that she was crying, and that "her hands were shaking."

When interviewed by the police, appellant initially denied that he knew the victim. He persisted in this denial when shown a photograph of N.P. He denied having sexual relations with anyone at 132 Chestnut Street except his "baby's mama." Later in the interview, appellant acknowledged that he had sexual intercourse with N.P., but said it was consensual.

Following a bench trial, the court found appellant guilty. Due to appellant's previous conviction for rape of a child, the court sentenced him, consistent with Code § 18.2-67.5:3, to a mandatory term of life in prison.

ANALYSIS

Although appellant assigns error to the sufficiency of the evidence for all of his convictions, he focuses his argument exclusively on the abduction with intent to defile conviction. Appellant does not present any argument to challenge the convictions for rape, forcible sodomy, and object sexual penetration.[1] Instead, his argument is that "the facts of the present case did not warrant a life sentence, and on that basis alone the trial court could and should have a reasonable doubt as to whether it should have convicted [appellant]." Appellant Br. at 5.

When reviewing a conviction for the sufficiency of the evidence, this Court asks only "'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" Maxwell v. Commonwealth, 275 Va. 437, 442, 657 S.E.2d 499, 502 (2008) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)).

The fact that appellant would be subject to a mandatory life sentence pursuant to Code § 18.2-67.5:3 if convicted does not inject an element of reasonable doubt. The notion of reasonable doubt with regard to the guilt phase of the trial has no connection with the severity of a sentence. Moreover, trial courts have no power of judicial nullification. See Taylor v. Commonwealth, 58 Va. App. 435, 449-50, 710 S.E.2d 518, 525 (2011) (trial courts have no inherent authority to acquit defendants when the evidence establishes guilt beyond a reasonable doubt).

We now turn to the crux of appellant's argument, the sufficiency of the evidence for the conviction of abduction with the intent to defile. Appellant relies on Brown v. Commonwealth, 230

---

[1] Although appellant does not appear to contest the sufficiency of the evidence on his convictions for rape, object sexual penetration, and sodomy, we note the evidence was amply sufficient to convict appellant of these offenses. The testimony of the victim, which the fact finder accepted and which was corroborated by her statements in the immediate aftermath of the crimes, by the DNA evidence, and by appellant's denial that he even knew the victim – a denial that the trial court could reasonably conclude was a lie offered to conceal his guilt – when combined, fully justify the trial court's conclusion that the prosecution had established appellant's guilt of these crimes.

Va. 310, 337 S.E.2d 711 (1985), to contend that the abduction was "of short duration" and "was part and parcel of the sexual assault." Appellant's Br. at 6. He also contends that when appellant pulled her back to the couch, it "was not done with the present intent to defile." Id. We find Brown inapplicable and the evidence sufficient to support a conviction for abduction with the intent to defile.

At common law, abduction required the "asportation" of the victim, that is, moving the victim from one location to another. See Scott v. Commonwealth, 228 Va. 519, 525-26, 323 S.E.2d 572, 575-76 (1984). In Scott, the Supreme Court concluded that the legislature, in enacting an abduction statute, eliminated the common law's asportation requirement. Under Virginia's abduction statutes, "the physical detention of a person, with the intent to deprive him of his personal liberty, by force, intimidation or deception, without any asportation of the victim from one place to another, is sufficient." Id. at 526, 323 S.E.2d at 576.

In Brown, the Court held that in making this change, the legislature "did not intend to make the kind of restraint which is an intrinsic element of crimes such as rape, robbery, and assault a criminal act, punishable as a separate offense." 230 Va. at 314, 337 S.E.2d at 713. The Court held that

> one accused of abduction by detention and another crime involving restraint of the victim, both growing out of a continuing course of conduct, is subject upon conviction to separate penalties for separate offenses only when the detention committed in the act of abduction is separate and apart from, and not merely incidental to, the restraint employed in the commission of the other crime.

Id. at 314, 337 S.E.2d at 713-14.

In this instance, appellant physically restrained the victim *before* he began to rape her. N.P. testified that she rose to leave when appellant made her uncomfortable, but he prevented her from doing so by pulling her back down to the couch. They then talked for a time, and, after this period of conversation, appellant then started to restrain N.P. anew so that he could rape her, among other

things. The initial detention was not "intrinsic" to the crime of rape – the rape had not even begun. Thus, it was "separate and apart from" the rape. See Smith v. Commonwealth, 56 Va. App. 711, 720-24, 697 S.E.2d 14, 18-20 (2010); Fields v. Commonwealth, 48 Va. App. 393, 632 S.E.2d 8 (2006).

"'Intent is the purpose formed in a person's mind which may, and often must, be inferred from the facts and circumstances in a particular case.'" Hughes v. Commonwealth, 18 Va. App. 510, 519, 446 S.E.2d 451, 457 (1994) (quoting David v. Commonwealth, 2 Va. App. 1, 3, 340 S.E.2d 576, 577 (1986)). The state of mind of an accused may be shown by his conduct and by his statements. Long v. Commonwealth, 8 Va. App. 194, 198, 379 S.E.2d 473, 476 (1989). Appellant lured N.P. to a house and proceeded to force himself onto her once she manifested her discomfort with his advances. Appellant's conduct and statements support the conclusion that the abduction that preceded the rape was effected with the intent to defile.

### CONCLUSION

We affirm the decision of the trial court.

Affirmed.